**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TANYA PORTER,**

                              **Plaintiff,**

     **vs.**                                                    **8:18-CV-1289**
                                                                    **(MAD/DJS)**

**THE TOWN OF FINE, NEW YORK; THE TOWN**
**BOARD OF THE TOWN OF FINE, NEW YORK;**
**HERB SNIDER,** *in his individual capacity and in his*
*capacity as Code Enforcement Officer of the Town of*
*Fine, New York*; **and DONNA LAWRENCE,**

                              **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**LEGAL AID SOCIETY OF NORTHEAST**        **VICTORIA M. ESPOSITO, ESQ.**
**NEW YORK – ALBANY**
95 Central Avenue
Albany, New York 12206
Attorneys for Plaintiff

**FITZGERALD MORRIS BAKER**                **STEPHANIE MCDERMOTT, ESQ.**
**FIRTH, P.C.**                            **JOHN D. ASPLAND, ESQ.**
68 Warren Street
Glens Falls, New York 12801
Attorneys for the Town Defendants

**HARTER SECREST & EMERY**                 **MICHAEL J. BERCHOU, ESQ.**
50 Fountain Plaza, Suite 1000
Buffalo, New York 14202-2293
Attorneys for Defendant Lawrence

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff commenced this action on November 2, 2018, pursuant to 42 U.S.C. § 1983,

against Defendants Town of Fine, New York, the Town Board of the Town of Fine, Herb Snider

(the "Town Defendants") and Donna Lawrence asserting a claim for a procedural due process violation, a state law claim for unlawful eviction, and a state law claim for conversion. *See* Dkt. No. 1. Upon initial review, the Court, among other things, dismissed the due process claim with respect to Defendant Lawrence. *See* Dkt. No. 9 at 3. Additionally, on August 24, 2021, Plaintiff voluntarily dismissed the unlawful eviction claim as to Defendant Lawrence, leaving only the state law conversion claim remaining against her. *See* Dkt. Nos. 74-75. Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos. 76-77.

## II. BACKGROUND

**A.      Plaintiff's Complaint Against the Town Defendants and Defendant Lawrence**

Plaintiff Tanya Porter currently resides in Gouverneur, New York. *See* Dkt. No. 80-11 at ¶ 6. In 2015, Plaintiff moved into a house at 309 Youngs Road, Star Lake, in the Town of Fine, New York (hereinafter "the property"). *See id.* at ¶ 7. Plaintiff lived at the property with Edwin Dowling, II, until May of 2018, when Plaintiff kicked Mr. Dowling out of the property. *See id.* at ¶ 8. Plaintiff has continuously been in a relationship with Mr. Dowling since 2015 and they have children in common. *See* Dkt. No. 80-12 at ¶¶ 2-3. In addition to their children in common, Plaintiff has children from a previous relationship. *See id.* Plaintiff's children are currently aged 13, 9, 5, 4, and 3 years old and, with the exception of the youngest child, lived with Plaintiff and Mr. Dowling at the property. *See id.* at ¶¶ 6-7.

At all times relevant to the instant action, the property was owned by Mr. Dowling's mother, Defendant Lawrence. *See* Dkt. No.80-11 at ¶ 9. In May 2018, Defendant Lawrence served Plaintiff with a Notice to Terminate. *See id.* at ¶ 10. The Notice to Terminate required Plaintiff to vacate the property by June 15, 2018. *See id.*

At a meeting of the Town of Fine Board of Supervisors on July 11, 2018, two local property owners were present to complain about their properties that were being rented out and the fact that the renters were refusing to leave.  *See* Dkt. No. 76-4 at 38.  The property owners noted that there was "an accumulation of garbage in the houses."  *Id.*  Defendant Snider, in his capacity as Code Enforcement Officer for the Town of Fine, had inspected one of the houses and shared pictures with the Board.  *See id.*  Defendant Snider requested the Board to issue "emergency orders of cleanup" under Section 7 of the Local Law for 2011, noting that the garbage presented a health hazard.  *See id.*  Town Board Member Jeremy Thompson noted that issuing such an order would result in the property owners being billed for the work, which would be added to their tax bills.  *See id.*  Mr. Thompson recommended consulting with the town attorney before anything was done.  *See id.*  Additionally, the suggestion was made that the Town could condemn the properties as a health hazard to get the tenants out and then the property owners would be able to clean up the properties themselves.  *See id.*  The Board ultimately did not issue the emergency cleanup order requested by Defendant Snider and did not vote on condemning the properties.  *See id.*

On July 14, 2018, Defendant Lawrence called Defendant Snider to complain about a swimming pool erected by Plaintiff in the yard at the property.  *See* Dkt. No. 80-11 at ¶ 13.  That same day, Defendant Snider conducted a visual inspection of the property during which he found an unpermitted pool and a well in the yard covered with only a piece of plywood.  *See id.* at ¶ 14; *see also* Dkt. No. 76-4 at 577.  Inside the house, Defendant Snider found animal feces, suspected black mold in the basement (as reported by Plaintiff), and a nonoperational water pump in the basement of the property.  *See* Dkt. No. 80-11 at ¶ 15.  Additionally, Defendant Snider noted bags of garbage on the front porch of the property.  *See id.* at ¶ 16.

3

On July 16, 2018, Defendant Snider posted a notice stating that the building was unsafe and that all occupants had to vacate the property. *See id.* at ¶ 17. The notice cited to sections of the New York Property Maintenance Code. *See id.* at ¶ 18. The notice did not, however, advise Plaintiff of her right to seek a hearing challenging the determination that the property was unsafe. *See id.* at ¶ 19.

Prior to the posting of the notice, there was no finding that the property was unsafe, nor was a notice filed in the St. Lawrence County Clerk's Office, as required by Local Law 1. *See id.* at ¶¶ 20-21. Additionally, Plaintiff was not served with eviction papers and a summary eviction proceeding was not commenced. *See id.* at ¶¶ 22-23. When he posted the notice, Defendant Snider informed Plaintiff that she would have to work with Defendant Lawrence to retrieve her belongings from the property. *See id.* at ¶ 24. Thereafter, Plaintiff retrieved some of her belongings from the property herself, while other belongings were delivered to Plaintiff by, or on behalf of, Defendant Lawrence. *See id.* at ¶¶ 25-26.

**B.    Plaintiff's Occupancy of the Property**

Plaintiff lived at the 309 Youngs Road property for approximately two and a half years, beginning in late 2015. *See id.* at ¶ 27. Plaintiff neither rented nor owned the property. *See id.* at ¶ 28. There was no lease between Plaintiff and Defendant Lawrence for the property. *See id.* at ¶ 29. The only document that indicated there was a landlord-tenant relationship between Defendant Lawrence and Plaintiff is the Landlord's Statement for the St. Lawrence County Department of Social Services. *See id.* at ¶ 30. The rent and utilities for the property was withheld from Mr. Dowling's social security payments. *See id.* at ¶¶ 31-32. In addition to herself, Mr. Dowling, and her children, the property was occupied by two cats and one dog. *See id.* at ¶ 34.

During her time at the property, Plaintiff noted that the basement was constantly damp, which caused some of her belongings to be ruined by mildew. *See id.* at ¶¶ 37-38. Additionally, from May 2018 through July 2018, there were continuous issues with the water pump. *See id.* at ¶ 39.

On May 15, 2018, Plaintiff received a Notice to Terminate from one of Defendant Lawrence's employees. *See* Dkt. No. 80-11 at ¶ 43. The Notice to Terminate was addressed to Plaintiff and her children, and it directed the named individuals to vacate the property by June 15, 2018. *See id.* at ¶¶ 44-45. Following receipt of the Notice to Terminate, Plaintiff was investigated by Child Protective Services ("CPS"). *See id.* at ¶ 46. CPS inspected the property and found that the bedrooms of two of Plaintiff's children, R.M. and T.B., were messy to the point that it would have impeded their exit in case of a fire. *See id.* at ¶¶ 47-48. Despite receiving the Notice to Terminate, Plaintiff did not vacate the property by June 15, 2018, as directed. *See id.* at ¶ 49.

The first time Plaintiff spoke with Defendant Snider was to obtain information about the Town's requirements when erecting a swimming pool. *See id.* at ¶ 50. Thereafter, on or around July 6, 2018, Plaintiff erected a pool on the property. *See id.* at ¶ 51. When the first load of water was delivered by the fire department, Plaintiff noticed that the pool was not level. *See id.* at ¶ 52. Although she considered draining the pool, Plaintiff was concerned about when she would be able to get another load of water and did not want the pool to be damaged as it sat empty. *See id.* at ¶ 53. Plaintiff also kept the water in the pool to use it to flush the toilet in the house when they did not have running water. *See id.* at ¶ 54. At no time between July 7 and July 14 did Plaintiff contact Defendant Snider to notify him that she was in the process of erecting a swimming pool at the property. *See id.* at ¶ 55. Although she did not contact Defendant Snider, Plaintiff did notify

Defendant Lawrence about the pool, who opposed there being a pool at the property. *See id.* at ¶¶ 56-57.

**C.      The July 14, 2018 Inspection of the Property**

A few days after Plaintiff notified Defendant Lawrence about the pool, Defendant Lawrence contacted Defendant Snider to lodge a complaint. *See id.* at ¶¶ 58, 161.  In response, Defendant Snider requested Defendant Lawrence to meet him at the property. *See id.* at ¶ 162. Additionally, Defendant Snider brought Frank LaPlante, a friend, with him to the property as a witness. *See id.* at ¶ 163.

Defendant Snider first conducted an inspection of the outside of the property, including the pool and the well. *See id.* at ¶ 59.  Upon observing the pool, Defendant Snider instructed Plaintiff that it would have to be removed because she did not have a permit for it. *See id.* at ¶ 164.  Thereafter, with Plaintiff's permission, Defendant Snider inspected the interior of the house at the property. *See id.* at ¶¶ 60, 165.  Defendant Snider went into the basement of the property because Heather Baldwin, a neighbor who was present, told him that there was black mold present there. *See id.* at ¶ 61.  Additionally, Defendant Snider was informed that the house did not have running water and Defendant Snider observed that the water pump was not functioning and that there was standing water on the floor of the basement. *See id.* at ¶¶ 62, 168-69. Defendant Snider further observed that there was a substantial amount of cat feces on the floor and household waste throughout the basement, kitchen, and porch. *See id.* at ¶¶ 170-72; Dkt. No. 76-4 at 566.  Finally, while in the basement, Defendant Snider observed the presence of black mold on the concrete walls. *See* Dkt. No. 76-4 at 568.

Sometime after Defendant Snider left the property, Mr. Dowling fixed the water pump, although Defendant Snider was not informed of this. *See* Dkt. No. 80-11 at ¶¶ 63-64.  On July 15,

2018, Defendant Snider returned to the property and inquired why the pool was not draining. *See id.* at ¶ 65. At this point, Mr. Dowling proceeded to drain the pool and Defendant Snider left. *See* Dkt. No. 76-4 at 199-200.

**D.    The July 16, 2018 Condemnation of the Property**

On July 16, 2018, Defendant Snider arrived at the property with Tricia Snyder, from CPS, and informed Plaintiff that he was condemning the house. *See* Dkt. No. 80-11 at ¶ 66. Defendant Snider informed Plaintiff that they were in imminent danger and had two hours to vacate the property. *See id.* at ¶ 67. Defendant Snider informed Plaintiff that the property was being condemned because of the black mold, unsanitary conditions, lack of running water, and the electrical issues that Plaintiff mentioned. *See id.* at ¶¶ 174-75. At no point did Plaintiff inform Defendant Snider or Ms. Snyder that Mr. Dowling had fixed the water pump and that the property now had running water. *See id.* at ¶ 68.

During his deposition, Defendant Snider testified that he did not want to condemn the property until CPS was present because he was concerned for the welfare of the children. *See* Dkt. No. 76-4 at 586-87. Initially, both Defendant Snider and Ms. Snyder left, but Defendant Snider returned to the property after two hours had elapsed. *See* Dkt. No. 80-11 at ¶ 69. Defendant Snider informed Plaintiff and Defendant Lawrence that nobody was permitted to live in the house on the property, but that Plaintiff could return to collect her personal property with Defendant Lawrence's permission. *See id.* at ¶¶ 71-72.

The first property maintenance code section Defendant Snider referred to on the condemnation notice was 108.1.1. *See id.* at ¶ 187. Defendant Snider determined that the electric stove was unsafe equipment as defined in this section. *See id.* at ¶ 188; *see also* Dkt. No. 76-4 at 620-21. The second property maintenance code listed on the condemnation notice was 108.1.2

7

due to the presence of faulty electrical wiring in the house and the electric stove.  *See id.* at ¶¶

189-90; *see also* Dkt. No. 76-4 at 622.  The final property maintenance code referred to on the

condemnation notice was 108.1.3 because of the unsanitary conditions created by the standing

water and black mold in the basement.  *See id.* at ¶¶ 191-92; Dkt. No. 76-4 at 623.

At no point did Defendant Snider notify Plaintiff that she had a right to a hearing, either

verbally or in writing.  *See* Dkt. No. 80-11 at ¶ 193.  Additionally, Plaintiff never had a post-

action hearing as provided for the supplemental code section 107.1.2, which sets forth the

procedures for when a property is condemned due to imminent danger.  *See id.* at ¶ 194; *see also*

Dkt. No. 76-4 at 624-25.  Moreover, Defendant Snider did not make a written report to the town

board about 309 Youngs Road as required by Local Law No. 1 of 1999.  *See id.* at ¶ 195.

Similarly, Defendant Snider did not file a notice with the county clerk with respect to the

property.  *See id.* at ¶ 196.

### E.    Defendant Snider

Defendant Snider became a Certified Code Officer in 2008.  *See* Dkt. No. 80-11 at ¶ 122.

In order to become a Certified Code Officer, Defendant Snider took a number of courses over a

six month time period.  *See id.* at ¶ 123.  As part of the continuing education requirement,

Defendant Snider has to complete twenty-four hours of coursework per year.  *See id.* at ¶ 124.

None of the training Defendant Snider has received has been specifically about mold.  *See id.* at ¶

133.

At all relevant times to the instant litigation, Defendant Snider was the Code Enforcement

Officer for the Town of Fine.  *See id.* at ¶ 125.  The position of Code Enforcement Officer

includes responsibilities such as issuing building permits for residential and commercial property,

issuing property maintenance permits, and performing inspections.  *See id.* at ¶ 126.  As part of

his job as Code Enforcement Officer, Defendant Snider completes inspections for property maintenance violations. *See id.* at ¶ 127. Approximately fifteen out of the twenty-to-fifty inspections completed by Defendant Snider on an annual basis are in response to complaints. *See id.* at ¶ 128.

It is Defendant Snider's responsibility to know and enforce the state and local laws as they relate to property inspections and the safety of properties. *See id.* at ¶¶ 129-30. Defendant Snider is also responsible for knowing and enforcing state and local laws as they relate to needed repairs to properties and as they relate to buildings that cause such a danger that they must be vacated. *See id.* at ¶¶ 131-32.

When Defendant Snider receives a complaint about a code violation, he goes to the property and talks to the occupant to determine whether the complaint is valid. *See id.* at ¶ 135. Defendant Snider usually attempts to solve any issues at the time he goes to inspect the property. *See id.* at ¶ 136. A citation for a violation is never issued without Defendant Snider personally inspecting a property. *See id.* at ¶ 137.

Every time that Defendant Snider visits a property, he brings a witness with him. *See id.* at ¶ 138. He does not inspect the interior of a property unless he has permission from the occupant. *See id.* at ¶ 140. In the event that Defendant Snider identifies a problem that is not so bad that the occupants need to leave the property, he tells the occupants that the problem needs to be fixed. *See id.* at ¶ 141. If there is a problem with the property and the occupant is not the owner, Defendant Snider will instruct the owner to address the problem. *See id.* at ¶ 142. If the identified problem can be remedied, Defendant Snider tries to avoid issuing a written notice. *See id.* at ¶ 143. If the occupant reports that the property owner has not fixed the problem, Defendant

Snider will then follow up with the owner. *See id.* at ¶ 144. Whether an eviction is pending at the time an inspection is made does not change Defendant Snider's process. *See id.* at ¶ 145.

As the Code Enforcement Officer, it is Defendant Snider's responsibility to notify a person of the right to request a hearing. *See id.* at ¶ 146. Moreover, it is Defendant Snider's understanding that a person is entitled to a hearing before they leave the house if there is no imminent danger. *See id.* at ¶ 147. Similarly, Defendant Snider testified that, if violations at a property are placing the occupants in imminent danger, the occupants may be entitled to a hearing either before or after they leave the house. *See id.* at ¶ 148.

Not at any point during his employment as the Town of Fine Code Enforcement Officer has Defendant Snider ever attended a hearing requested by an occupant before being removed from a building. *See id.* at ¶ 149. In fact, to his knowledge, there has never been such a hearing held during Defendant Snider's time as Code Enforcement Officer for the Town of Fine. *See id.* at ¶ 150. Similarly, Defendant Snider has never attended a hearing requested by an occupant after being removed from a building. *See id.* at ¶ 151. Nor does Defendant Snider believe that such a hearing has been held during his time as Code Enforcement Officer for the Town of Fine. *See id.* at ¶ 152. At the time of this incident, Defendant Snider did not notify occupants or tenants of the right to have a hearing. *See id.* at ¶ 153. In his capacity as Code Enforcement Officer, Defendant Snider has condemned only two other properties in the Town of Fine. *See id.* at ¶ 154.

### III. DISCUSSION

**A.    Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.**      **Procedural Due Process**

The Town Defendants contend that they are entitled to summary judgment on Plaintiff's procedural due process claim because Defendant Snider's condemnation of the property was a random, unauthorized act and there was a meaningful post-deprivation remedy available to Plaintiff, *i.e.*, an Article 78 proceeding.  *See* Dkt. No. 78-1 at 12-14.

"To state a claim for deprivation of property without due process of law, a plaintiff must identify a property interest protected by the Due Process Clause." *Harrington v. County of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) (citing *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010)).  The plaintiff must then demonstrate that he was deprived of that property right without due process of law.  *See Woe v. Spitzer*, 571 F. Supp. 2d 382, 387 (E.D.N.Y. 2008) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)).  "When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York ("HANAC")*, 101 F.3d 877, 880 (2d Cir. 1996) (citing *Hudson v. Palmer*, 468 U.S. 517, 532 (1984)).  In the case of random, unauthorized acts, a due process violation does not occur "so long as the State provides a meaningful postdeprivation remedy." *Id.* (citing *Hudson*, 468 U.S. at 531).  "As the Second Circuit has emphasized ... 'where ... a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, an Article 78 proceeding is a perfectly adequate postdeprivation remedy.'" *Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d 245, 254 (E.D.N.Y. 2014) (quoting *Grillo v. N.Y.C. Transit Auth.*, 291 F. 3d 231, 234 (2d Cir. 2002)); *see also Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 467 (2d Cir. 2006) (citing *Locurto v. Safir*, 264 F.3d 154, 172 (2d Cir. 2001)); *Attallah v. New York College of Osteopathic Medicine*, 94 F. Supp. 3d 448, 455 (E.D.N.Y. 2015) (finding an Article 78 proceeding to be an adequate post-deprivation remedy).  Even if an Article 78 proceeding would no longer be available, the fact that it was previously available satisfies the requirements of due process.  *See O'Leary v. Town of Huntington*, No. 11-cv-3754, 2012 WL 3842567, *12 (E.D.N.Y. Sept. 5, 2012) (citing *Campo v. N.Y.C. Employees' Ret. Sys.*, 843 F.2d 96, 102 n.6 (2d Cir. 1988)) (other citation omitted).

However, the Second Circuit also instructs that the availability of a post-deprivation procedure does not necessarily satisfy due process when the deprivation occurs in accordance with established state procedures. *See HANAC*, 101 F.3d at 880 (citing *Hudson*, 468 U.S. at 532).

In *HANAC*, a contractor filed a Section 1983 suit against New York City and former Mayor Giuliani after the Mayor ordered that any City contracts held by the contractor be terminated and that the contractor was effectively ineligible for any future City contracts. *See HANAC*, 101 F.3d at 879. The contractor, HANAC, alleged that the City violated the Fourteenth Amendment when it deprived it of its property interest in the contracts without due process. *See id.* at 880. After distinguishing between due process claims based on "established state procedures" and those based on "random, unauthorized acts," the Second Circuit stated that HANAC's claim was based on a random, arbitrary act. *See id.* at 881. The Second Circuit noted that "[HANAC] makes no claim that the due process violation was caused by an established state procedure, such as the City Charter or PPB Rules. To the contrary, HANAC argues that state officials acted in flagrant violation of the City Charter and PPB Rules." *Id.* For that reason, the court found the availability of an Article 78 proceeding barred HANAC's due process claim. *See id.* at 881-82.

In the years since *HANAC*, the Second Circuit "has noted, '[t]he distinction between random and unauthorized conduct and established state procedures ... is not clear-cut.'" *Rios v. Town of Huntington Housing Auth.*, 853 F. Supp. 2d 330, 338 (E.D.N.Y. 2012) (quoting Rivera-Powell, 470 F.3d at 465). In *Rivera-Powell*, the Second Circuit further recognized that "the [Supreme] Court held that government actors' conduct cannot be considered random and unauthorized ... if the state delegated to those actors 'the power and authority to effect the very

13

deprivation complained of ... [and] the concomitant duty to initiate the procedural safeguards set up by state law,' even if the act in question 'was not ... sanctioned by state law.'" *Rivera-Powell*, 470 F.3d at 465 (quoting *Zinermon v. Burch*, 494 U.S. 113, 138 (1990)).  In addition, the acts of high-ranking officials with final decision-making authority may not be considered "'random and unauthorized' conduct for the purposes of a procedural due process analysis." *Id.* (quoting *Velez v. Levy*, 401 F.3d 75, 91-92 & nn.14 & 15 (2d Cir. 2005)).  Examples of such "high ranking" state officials with final decision-making authority include the Chancellor of the New York City Schools, *see Velez*, 401 F.3d at 92 ("Levy is precisely the sort of 'high ranking' official identified by this line of cases"), and the Commissioner of the New York State Department of Health, *see DiBlasio v. Novello*, 344 F.3d 292, 303 (2d Cir. 2003) ("The Commissioner of the N.Y. D.O.H. is a high-level state official with final authority on many department matters").

Several Courts faced with the difficulty of distinguishing due process deprivations caused by random, unauthorized conduct from those caused by established state procedures, have analyzed claims under both theories.  *See e.g., Pierre v. N.Y.C. Taxi & Limousine Comm'n.*, No. 17-CV-973, 2017 WL 1417257, *4-5 (E.D.N.Y. Apr. 19, 2017); *Rios*, 853 F. Supp. 2d. at 339-44. For example, the court in *Rios* stated that whether the deprivation alleged was caused by the random and unauthorized actions of a state actor or by established state procedure was immaterial because, under the facts presented, analysis under either theory would lead to the same result.  *See Rios*, 853 F. Supp. 2d. at 339.  There, the court found that the availability of an Article 78 proceeding insured due process and that the established state procedures complied with the requirements of due process.  *See id.* at 339-44.  In *Pierre*, the court interpreted the plaintiff's complaint as pleading a "random deprivation of his rights" and found that the availability of an Article 78 proceeding protected his right to due process.  *See Pierre*, 2017 WL 1417257, at *4.

However, in the alternative, the *Pierre* court stated that the pre-deprivation procedures in place had previously been found to comport with due process. *See id.* at *5.

Courts also look to whether the plaintiff alleges that the state procedures in place are themselves to blame for a deprivation of due process. *See e.g., Ahmed*, 7 F. Supp. 3d at 254-55; *Byrne v. Ceresia*, No. 09 Civ. 6552, 2011 WL 5869594, *4 (S.D.N.Y. Nov. 22, 2011) (quoting *Terio v. Johann*, No. 05 Civ. 5918, 2006 WL 2819659, * 7 (S.D.N.Y. Sept. 29, 2006)).  In *Ahmed*, the court noted that the plaintiffs did not challenge the adequacy of due process provided in an Article 78 proceeding or the adequacy of the applicable provisions of the Town Code.  *See Ahmed*, 7 F. Supp. 3d at 254-55.  Similarly, the *Byrne* court found it significant that the plaintiff "does not allege that the state procedures in place, if strictly complied with, would be insufficient due process under the Fourth Amendment." *Byrne*, 2011 WL 5869594, at *4 (quoting *Terio*, 2006 WL 2819659, at *7).  The *Byrne* court characterized the plaintiff's argument as asserting that the defendants misapplied state law and acted in "'flagrant violation' of required procedures" which supported the court's finding that the action was random and arbitrary. *Id.* (quoting *HANAC*, 101 F.3d at 880).

Ultimately, "[t]he underlying question is 'whether the state [was] in a position to provide for pre-deprivation process.'" *Polito v. City of New York*, No. 15-CV-2301, 2017 WL 6542457, *2 (E.D.N.Y. Dec. 21, 2017) (quoting *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)).  For this reason, courts may find complained of deprivations to be "random and unauthorized" unless a plaintiff is able to plausibly allege or establish "'that the deprivation ... was effected' through government policy." *Frith v. Hill*, No. 07 Civ. 5899, 2009 WL 3073716, *17 (S.D.N.Y. Sept. 23, 2009).  When a plaintiff alleges that the deprivation of a property interest resulted from an

"insidious conspiracy" among government actors, "there is no reasonable way that the state can provide pre-deprivation process." *Polito*, 2017 WL 6542457, at *2.

In *Hong Tang v. Grossman*, on October 16, 2016, the defendant, in his capacity as New York City Fire Marshal, served the plaintiff with an eviction notice. *See Hong Tang v. Grossman*, No. 19-cv-6099, 2021 WL 1091908, *1 (E.D.N.Y. Mar. 22, 2021). On October 13, 2016, the New York State Supreme Court issued a temporary stay of that notice, which was served on the defendant. *See id.* The temporary stay was lifted on October 27, 2016. *See id.* Pursuant to the New York City Marshals Handbook of Regulations, "'[t]he marshal must give the [tenant]-respondent an additional notice of eviction where a Court order stays the eviction after service of a notice of eviction and the stay later expires or is vacated, unless the Court specifically waives the requirement of an additional notice[.]'" *Id.* Rather than serving the plaintiff with an additional notice of eviction, however, the defendant "'took legal possession of the premises on November 3, 2016 by surprise,'" despite the plaintiff informing the defendant that no additional notice of eviction had been given and that such additional notice was required by law and the Marshals Handbook. *See id.* The plaintiff alleged that the Fire Marshal defendant's failure to abide by the Marshals Handbook was a result of the City's failure to provide adequate training and supervision, and a result of municipal policies. *See id.*

In dismissing the plaintiff's procedural due process claim, the court held that New York provides adequate post-deprivation remedies to satisfy due process to protect against random and unauthorized conduct. *See id.* at *6. The court noted that the plaintiff could have challenged the unlawful eviction either through a proceeding brought pursuant to the New York State Real Property and Procedure Law or pursuant to Article 78. *See id.* at *6-7, n.7. Specifically, the court held that because the plaintiff "'does not allege that the state procedures in place, if strictly

complied with, would be insufficient due process under the Fourteenth Amendment,' his procedural due process claim" must be dismissed. *Id.* at *7 (quoting *Terio v. Johann*, No. 05-cv-5918, 2006 WL 2819659, *7 (S.D.N.Y. Sept. 29, 2006), *aff'd*, 257 Fed. Appx. 374 (2d Cir. 2007)).

In *Byrne v. Ceresia*, No. 09 Civ. 6552, 2011 WL 5869594 (S.D.N.Y. Nov. 22, 2011), the plaintiff was a court security officer in the New York State Unified Court System. *See Byrne v. Ceresia*, No. 09 Civ. 6552, 2011 WL 5869594, *1 (S.D.N.Y. Nov. 22, 2011), *aff'd*, 503 Fed. Appx. 68 (2d Cir. 2012). After being injured on the job on August 4, 2005, the plaintiff received several medical opinions indicating that the plaintiff would not be able to return to full work duties, but that he could engage in light duty activity. *See id.* After receiving these medical reports, the plaintiff did not request and the defendants did not offer a light duty assignment, nor did the parties engage in any communication regarding a possible reasonable accommodation that might allow the plaintiff to return to work. *See id.* at *2. Rather, the plaintiff simply did not report to work after sustaining his injury in August 2005. *See id.* On August 4, 2006, one of the defendants, Judge Ceresia, the Administrative Judge for the Third Judicial District, sent a letter informing the plaintiff that the Office of Court Administration was terminating his employment effective immediately. *See id.* In his letter to the plaintiff, Judge Ceresia failed to apprise him of (1) the reasons for his termination; (2) his right to contest the decision; (3) the process for contesting the decision; and (4) that, upon contesting the decision, his termination would be held in abeyance pending a final determination. *See id.* Initially, Judge Ceresia did not respond to a letter from the plaintiff's counsel demanding rescission of his termination, an explanation of the reasons for his termination, and alleging that his due process rights had been violated. *See id.* Upon receipt of a second such letter, Judge Ceresia responded, explaining the basis for the

termination, informed him of his right to request a hearing, but did not notify the plaintiff that his termination would be stayed pending the outcome of any such hearing. *See id.* After a hearing was held, the hearing officer found that the parties should have engaged in an interactive process prior to the plaintiff's termination to determine whether a reasonable accommodation could have facilitated his return to work and recommended that the plaintiff's notice of termination be rescinded. *See id.* After receiving the hearing officer's recommendation, Judge Plumadore confirmed the plaintiff's termination, finding that there was no accommodation that would allow him to return to work. *See id.* at *3. The plaintiff then appealed that decision to Chief Administrative Judge Ann Pfau, who upheld the decision. *See id.*

In granting the defendants motion for summary judgment, the court noted that the plaintiff was not alleging that the state procedures in place, if strictly complied with, would be insufficient due process under the Fourteenth Amendment. *See id.* at *4. Rather, the plaintiff was asserting that the manner in which the defendants misapplied state law deprived him of his employment without due process. *See id.* Specifically, the court noted that because the plaintiff "'makes no claim that the due process violation was caused by an established state procedure,' but rather 'argues that state officials acted in flagrant violation' of required procedures, he essentially contends that 'the alleged deprivation of a protected property ... interest without due process of law occurred because of a random and arbitrary act.'" *Id.* (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York ("HANAC")*, 101 F.3d 877, 880 (2d Cir. 1996)). In such situations, the court found that a post-deprivation Article 78 proceeding is all that is required to satisfy due process. *See id.* Additionally, the court acknowledged that acts of high-ranking officials who are the "'ultimate decision-marker[s]' and have 'final authority over significant matters'" should not be considered "random and unauthorized" for purposes of this analysis. *See*

*id.* at *5 (quoting *Rivera-Powell*, 470 F.3d at 465) (other citations omitted).  However, the court held that Judges Ceresia and Plumadore were not "ultimate decision-makers" because it was Chief Administrative Judge Pfau who possessed and exercised the "final authority" to approve the plaintiff's termination.  *See id.*  The Second Circuit affirmed the grant of summary judgment.  *See Byrne v. Ceresia*, 503 Fed. Appx. 68 (2d Cir. 2012).

In the present matter, the record makes clear that Defendant Snider acted in a random and unauthorized manner and that he was not an ultimate decision-maker with final authority.  As Plaintiff sets out in its response, pursuant to Local Law 2 of 2006 of the Town of Fine and Local Law 1 of 1999, Code Enforcement Officers are required to keep permanent official records of all transactions and activities; to provide written annual reports to the Town Board; and to provide written recommendations to the board as to whether unsafe buildings should be repaired or demolished.  *See* Dkt. No. 80-10 at 16.  "The laws do not empower the Code Enforcement Officer to unilaterally condemn a building; this matter must be done by town resolution." *Id.*  Moreover, the International Property Maintenance Code of 2015, together with a 2016 Technical Bulletin outlining occupants' due process right, specified that notices to occupants should advise them of their right to a pre- or post-deprivation hearing.  *See id.* (citing Dkt. Nos. 80-6, 80-7 & 80-8).

In condemning the property, Defendant Snider failed to gain approval by the Town Board, failed to provide Plaintiff notice prior to the condemnation, and failed to apprise her of the right to a post-deprivation hearing.  As in *Byrne*, Defendant Snider did not merely play "fast and lose with the rules," he simply "never took the rulebook off the shelf."  *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 143 (S.D.N.Y. 2016) (citing *Byrne*, 2011 WL 5869594, at *4). Similarly, as Plaintiff's own submissions make clear, Defendant Snider was not the "ultimate

decision-maker" on this issue.  Rather, the decision to condemn a property had to be voted on by the Town Board.

The arbitrary manner in which Defendant Snider acted is further demonstrated by the discussion that took place at the Town Board meeting on July 11, 2018, when two local property owners complained about their properties that were being rented out and the fact that the renters were refusing to leave.  *See* Dkt. No. 76-4 at 38.  The property owners noted that there was "an accumulation of garbage in the houses."  *Id.*  Defendant Snider had inspected one of the houses and shared pictures with the Board.  *See id.*  Defendant Snider requested the Board to issue "emergency orders of cleanup" under Section 7 of the Local Law for 2011, noting that the garbage presented a health hazard, which they declined to do because the costs would be borne by the owners.  *See id.*  Town Board Member Jeremy Thompson recommended consulting with the town attorney before anything was done.  *See id.*  Additionally, the suggestion was made that the Town could condemn the properties as a health hazard to get the tenants out and then the property owners would be able to clean up the properties themselves.  *See id.*  The Board ultimately did not issue the emergency cleanup order requested by Defendant Snider and did not vote on condemning the properties.  *See id.*  Despite the fact that the Town Board did not approve either of the proposed actions, Defendant Snider testified that, after the July 11, 2018 meeting, he condemned both of the properties over the course of the following week, without receiving permission from the Town Board.  *See* Dkt. No. 76-4 at 543-44, 607.  During his time as Code Enforcement Officer, beginning in 2012 through the date of his deposition in this matter, the property and the two discussed at the July 11, 2018 Town Board Meeting are the only three properties that he has ever condemned.  *See id.* at 476, 607.  The fact that the only properties

Defendant Snider has ever condemned occurred during the same week in July 2018 further demonstrates the arbitrary and random manner in which he acted.

Finally, the fact that Defendant Snider did not inform Plaintiff that she had the right to a hearing before the Town Board or that she could challenge the condemnation through an Article 78 proceeding does not change this result.  The Supreme Court has held that due process does not require "individualized notice of state-law remedies which ... are established by published, generally available state statutes and case law." *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999).  Once a deprivation has occurred, a plaintiff "can turn to these public sources to learn about the remedial procedures available to him.  The City need not take other steps to inform him of his options." *Id.*  Moreover, in reliance on *West Covina*, the Second Circuit recently confirmed "that the federal procedural due process guarantee does *not* require state officials to inform individuals of all the procedural guarantees they enjoy under state law." *Liberian Cmty. Ass'n v. Lamont*, 970 F.3d 174, 192 (2d Cir. 2020) (emphasis in original).

Accordingly, the Court grants the Town Defendants' motion for summary judgment insofar as to the procedural due process claim brought against Defendant Snider.

## C.    *Monell* Liability

To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *see also Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020).  A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making

authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.  *See Iacovangelo v. Corr. Med. Care, Inc.*, 624 Fed. Appx. 10, 13-14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Village of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions); *see also Hansen v. Watkins Glen Cent. Sch. Dist.*, 832 Fed. Appx. 709, 715 (2d Cir. 2020) (affirming the district court's finding that the defendant's "restricted access to school property on only four other occasions in the more than ten years he served as a [s]uperintendent" did not amount to a custom or policy).  "Deliberate indifference is not demonstrated on every occasion that a plaintiff has reported potential rights violations to a policymaker: rather, constitutionally cognizable deliberate indifference is a 'stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *O'Kane v. Plainedge Union Free Sch. Dist.*, 827 Fed. Appx. 141, 143 (2d Cir. 2020) (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).

"[U]nder *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Hum. Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999); *see also Rutigliano v. City of New York*, 326 Fed. Appx. 5, 9 (2d Cir. 2009).  "[E]ven in situations where the acts or omissions of individual

employees do not violate an individual's constitutional rights, 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate' those rights." *Barrett*, 194 F.3d at 350 (quotations omitted).  In addition, where "the individual defendants violated plaintiff's rights but nonetheless enjoy qualified immunity," a plaintiff can pursue a *Monell* claim.  *Bonilla v. Jaronczyk*, 354 Fed. Appx. 579, 582 (2d Cir. 2009) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001)).

In the present matter, the Court finds that the Town of Fine and the Town Board are entitled to summary judgment on Plaintiff's *Monell* claim.  Initially, the Court notes that the record is bereft of any formal policies, officially promulgated by the Town relating to the alleged violation of Plaintiff's constitutional rights.

Plaintiff, however, contends that Defendant Snider was "the Town's policymaker with respect to code enforcement matters."  Dkt. No. 80-10 at 14.  "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."  *Rookard v. Health & Hosp. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)).  "An allegation of policy-making authority thus requires proof of the official's scope of employment and his role within the municipal or corporate organization." *Id.*  "An official's title, though not dispositive of his authority to make policy, ... is relevant for the inferences fairly to be drawn therefrom." *Id.* (internal citation omitted).  The Second Circuit has noted that, although "[m]ayors may be treated as policy-makers without proof of their specific powers and responsibilities, ... [l]essor officials .... cannot similarly be presumed to embody plenary municipal power."  *Id.* at 45 n.4 (citing *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2d Cir. 1980)).

In *Diodati v. City of Little Falls*, No. 6:04-cv-446, 2007 WL 189130 (N.D.N.Y. Jan. 18, 2007), the court noted that "[a] policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.'" *Id.* at *2 (quoting *Anthony v. City of New York*, 229 F.3d 129, 139 (2d Cir. 2003)).  The court continued that "[a]n individual who merely has discretion to handle a particular situation is not a policymaker." *Id.* (citing *Anthony*, 339 F.3d at 139-40).  As in *Diodati* and *Anthony*, the record here makes clear that Defendant Snider was not a municipal policymaker.  Rather, as discussed in more detail above, Defendant Snider was merely afforded the discretion to handle particular situations in his area of responsibility pursuant to laws and resolutions promulgated by New York and the Town Board.

Plaintiff further contends that "Defendant Snider also maintained and the Town tacitly condoned an established practice of consistently and continually refusing to afford occupants notice of their right to a hearing or to make written reports to the board for action by resolution." Dkt. No. 80-10 at 16.  However, as discussed above, Defendant Snider became the Code Enforcement Officer in 2012 and the only three properties he has ever condemned were all during the same week in July 2018.  Three isolated incidents are insufficient to establish a widespread and persistent practice warranting the imposition of municipal liability.  *See Jones v. Town of East Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (holding that three incidents "fell far short of showing a policy, custom, or usage of officers"); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (holding that four similar constitutional violations "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability"); *White v. City of New York*, No. 15 Civ. 6696, 2016 WL 4750180, *12 (S.D.N.Y. Sept. 12, 2016)

24

(holding that six incidents over five years were insufficient to plausibly allege the existence of a municipal policy).

Similarly, municipal liability is not supported on the theory of failure to train or supervise. The existence of an official municipal policy or custom can also be demonstrated by establishing a deliberate government policy of failing to train or supervise its officers. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). The Supreme Court has explained that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Where municipal liability is based on inaction, "rigorous standards of culpability and causation must be applied" to ensure against vicarious liability. *Board of Cnty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997).

In order for municipal liability to attach on a failure-to-train theory, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (quoting *City of Canton*, 489 U.S. at 388). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quotation omitted). To establish deliberate indifference in the context of a failure-to-train claim, a plaintiff must set forth evidence demonstrating that (1) the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) either the situation presents the employees with a difficult choice of the sort that training will make less difficult, or there is a history of employees mishandling the situation, and (3) the wrong choice by the employee will frequently cause a constitutional deprivation. *See Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

The record establishes that, in order to become a Certified Code Officer, Defendant Snider was required to complete a number of courses over a six month time period.  *See* Dkt. No. 80-11 at ¶ 123.  Additionally, as part of the continuing education requirement, Defendant Snider is required to complete twenty-four hours worth of coursework per year.  *See id.* at ¶ 124.  In an entirely conclusory manner, Plaintiff contends that "Defendant Snider has had no on-the-job training; he did not serve a probationary period, and he is not evaluated formally or informally." Dkt. No. 80-10 at 15.  This conclusory assertion is insufficient to support a finding that the Town was deliberately indifferent so as to warrant the imposition of municipal liability.

Accordingly, the Court finds that the Town Defendants are entitled to summary judgment as to Plaintiff's *Monell* liability claim.

**D.     State Law Claims**

Where, as here, a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise supplemental jurisdiction over remaining state-law claims.  *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006).  The decision is a discretionary one, and its justification "lies in considerations of judicial economy, convenience and fairness to litigants[.]" *United Mine Workers of Am.*, 383 U.S. at 726; *see also Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction") (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Here, after carefully considering the relevant factors, *i.e.*, economy, convenience, fairness, and comity, the Court finds that they weigh decidedly in favor of declining to exercise

supplemental jurisdiction over Plaintiff's remaining state law claims.[1]  Accordingly, the Court will dismiss Plaintiff's state-law claims without prejudice pursuant to 28 U.S.C. § 1367(d).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, the Court hereby

**ORDERS** that Defendants' motions for summary judgment (Dkt. Nos. 76 & 77) are **GRANTED**; and the Court further

**ORDERS** that Plaintiff's procedural due process claim is **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's state-law claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1367(d); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 6, 2022
          Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[1] Additionally, the Court notes that Plaintiff's unlawful eviction claim involves a somewhat unique set of circumstances, in which the tenant of the property, Mr. Dowling, was no longer residing at the premises and Plaintiff did not pay rent or have a lease with Ms. Lawrence. As such, the Court is justified in declining supplemental jurisdiction pursuant to Section 1367(c)(1) as well.